**PUGET SOUND SALMON EGG COM-
PANY, Inc., Plaintiff,**

v.

**SHOSHONI, INC., Lucky Brands, Inc.,
and K. Clint Stephens, an indi-
vidual, Defendants.**

Civ. No. 1–69–60.

United States District Court,
D. Idaho,

Nov. 6, 1970.

John O. Graybeal, Graybeal, Cole & Barnard, Seattle, Wash., Eberle & Berlin, John L. Runft, Boise, Idaho, for plaintiff.

Zachreson & Hansen, Boise, Idaho, B. Deon Criddle, Salt Lake City, Utah, for defendants.

## FINDINGS OF FACT
## AND
## CONCLUSIONS OF LAW

McNICHOLS, District Judge.

### FINDINGS OF FACT

#### I.

This is an action for an injunction and for damages arising out of infringement of United States Patent No. 2,951,761, for "Fish Bait", which patent issued on September 6, 1960, on an application Serial No. 735,951, filed May 19, 1958, which application was a continuation of application Serial No. 467,896, filed November 9, 1954. Defendants have counterclaimed for a declaratory judgment of patent invalidity and for unfair competition.

#### II.

Plaintiff, Puget Sound Salmon Egg Company, Inc., is a Washington corporation having an established place of business at 1440 South Jackson Street, Seattle, Washington.

#### III.

United States Letters Patent No. 2,951,761, issued to John Thomas Stephan, and said John Thomas Stephan has been and continues to be the sole owner of United States Letters Patent No. 2,951,761.

## IV.

Plaintiff, Puget Sound Salmon Egg Company, Inc., is the exclusive licensee of John Thomas Stephan under United States Letters Patent No. 2,951,761, by reason of a license agreement dated November 19, 1956, under which agreement Puget Sound Salmon Egg Company, Inc. is authorized to bring and maintain this action.

## V.

Defendant, Shoshoni, Inc., is an Idaho corporation, formerly having an established place of business at 108 East 40th, Boise, Idaho, and presently having an established place of business near Meridian, Idaho, in this judicial district.

## VI.

Defendant, K. Clint Stephens, is and has been the President of defendant, Shoshoni, Inc. since the founding of said corporation, and resides at 406 North DeClark Street, Emmett, Idaho.

## VII.

By Consent Judgment and Decree entered September 2, 1970, the Complaint against Lucky Brands, Inc. was settled and dismissed, with the defendant Lucky Brands, Inc. having been enjoined along with its officers, agents, servants and employees from infringement of United States Letters Patent No. 2,951,761.

## VIII.

This Court has jurisdiction over the parties and subject matter of this action. Jurisdiction and venue of the infringement claims are based on 28 U.S.C. Sections 1338(a) and 1400(b), and the patent laws of the United States. Jurisdiction and venue of the counterclaim for declaratory judgment are properly before this Court as provided by the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202.

## IX.

In their natural state, salmon eggs have a slightly acidic pH of about 6.3 and a solids content of about 38–45% by weight. Expanded eggs have a smaller solids content, often about 20% by weight in commercial practice.

## X.

Unexpanded salmon eggs were processed and sold by various companies as fish bait long prior to the invention of the patent in suit. Sellen Patent No. 1,703,324 which was before the Patent Office during the prosecution of the patent in suit, and Tereski Patent No. 2,743,185, disclose two methods of processing unexpanded bait fish eggs.

## XI.

Siberian Fish Products Company, of Seattle, Washington, marketed an expanded bait fish egg prior to the invention of the patent in suit. The actual manner of processing the Siberian egg has been maintained as a secret by the processor and the nature of the process is not determinable by analysis of the bait eggs as marketed.

## XII.

Neptune Fish Products Company, of Seattle, Washington (according to the testimony of its owner Mrs. Dorotha B. Kinney), produced and sold expanded fish eggs even prior to World War II. Documents and testimony established that Neptune Fish Products Company in 1948 and 1949 marketed a Sure Strike brand egg which was expanded in nature and was characterized by a substantial amount of acetate ion. These eggs were processed by a process involving soaking of the eggs in an acetic acid solution of about pH 3 for at least 48 hours, followed by soaking of the eggs in 3 to 6 changes of water solution. However, Neptune Fish Products Company kept this process and its other egg processing techniques secret and concealed to the extent that not even employees of Neptune knew of the nature of the processing or the chemicals used, in part by misbranding or not branding the chemicals involved. Testimony of plaintiff's

expert witnesses indicated that the nature of the Neptune processing is not determinable by analysis of the eggs as marketed.

## XIII.

Mr. Nicholas Andreev while he was an employee of Neptune Fish Products Company prior to October, 1942, had attempted unsuccessfully to produce a marketable expanded fish egg for bait purposes prior to Stephan's invention. Spoilage of the eggs a short time after processing was the principal problem encountered at that time.

## XIV.

In the early 1950's Mr. Steve Sarich, Jr., President of the plaintiff Puget Sound Salmon Egg Company, Inc., had recognized the market need for an expanded bait fish egg and, being aware of the Siberian expanded egg, had tried to duplicate it using a hydroxide or base type expansion process, without success.

## XV.

After having exhausted his own ideas, Mr. Sarich retained Dr. Charles Shockey of Seattle Pacific College to attempt to develop an expanded bait fish egg which would not spoil, and Dr. Shockey's efforts in this respect were likewise unsuccessful.

## XVI.

Mr. Sarich next contacted John Thomas Stephan, an experienced protein chemist, furnished a sample of the expanded Siberian egg to him, and asked him to develop a marketable expanded egg for Puget Sound Salmon Egg Company, Inc. At that time it was believed there would be a market demand for a large but relatively soft egg for use in lake fishing. This type egg would not have to be able to stay on a hook during repeated casting, and would not be exposed to the strong currents of rivers or streams. Knowing the Siberian egg to have a pH in the alkaline range, Mr. Stephan first unsuccessfully attempted to produce an egg using processing materials such as sodium hydroxide and other bases. After several hundred experiments, ranging from use of bases, salts and a wide variety of organic compounds such as urea and resins, Mr. Stephan discovered that an acid soak followed by a water soak could be used successfully to expand fish eggs, and that eggs prepared in this manner would not spoil. After a number of additional experiments, Mr. Stephan finalized the invention of the patent in suit.

## XVII.

Stephan U.S. Patent No. 2,951,761 has nineteen claims. Broadly, the invention involves, in the language of broadest claim 1:

"1. A process for swelling fish eggs comprising the steps of soaking the eggs in an acid solution followed by soaking in water until swollen".

Claims 3, 5 and 13 similarly recite the steps of acid soaking and water soaking, with additional limitations as to storing the eggs in a hermetically sealed container (claim 3), a fluorescent dye being present in the acid solution and the eggs being swollen to at least 125% of the original volume (claim 5), and the acid solution having a pH below about 5.0 (claim 13). Claims 2, 4, 6 and 14 are so-called product-by-process claims, respectively depending from claims 1, 3, 5 and 13.

Claim 15 of the patent recites, preliminary to the acid soak and water soak steps, a cooking step which is conventional per se in the art. Specifically, the wording of claim 15 is as follows:

"15. A process for swelling fish eggs comprising the steps of heating fish eggs in a saline solution containing a protein hardening agent, removing the eggs from the saline solution, soaking the eggs in a solution having a pH below about 5.0, removing the eggs and soaking the eggs in water until swollen."

Process claim 17 is similar to claim 15 and in addition calls for "treating the eggs with a preservative and hermetically sealing the eggs in a container". Claims 16 and 18 are of the so-called product-by-process type and respectively depend from claims 15 and 17.

Claim 19, the most specific claim in the patent, states:

"19. A process for making fish bait which comprises immersing salmon eggs in sodium chloride solution more concentrated than 15% and containing from between 0.5 and 30 ounces of 37% formaldehyde solution per 100 gallons of brine, heating the eggs and brine solution to a temperature between 120°F. and the boiling point of the solution for a period of time from 10 minutes to two hours, draining and washing the eggs free of brine, immersing the eggs in an aqueous solution having a pH more acid than about 4.0 for a period of time between 2 and 24 hours, draining and washing the eggs free of acidic solution, and soaking the eggs in fresh water having a temperature between 70° F. and 180° F. for a period of time between 3 minutes to 24 hours to increase their water content and until a volume change takes place rendering the eggs at least about 125% their original volume."

Plaintiff has not alleged that claims 7–12 are infringed, and thus the infringement of these claims is not at issue in this action.

### XVIII.

The description portion of the patent in suit includes Examples I–IV. Expert testimony was offered by both plaintiff and defendants on the issue of operability of the Examples, and the thrust of defendants' evidence in this respect was primarily understood to be that the temperature and time of heating of the eggs preliminary to the acid soak were insufficient to obtain adequate hardening of the eggs. In this respect, Example I discloses heating at 140°F. for about 15 minutes, Example II discloses heating to 140° F. for about 10 minutes, Example III discloses heat treating at 160°F. for twenty minutes, and Example IV discloses boiling the eggs for 10 minutes. However, the accompanying patent description at column 3, lines 12–25, indicates there can be considerable variation in time and temperature of heat treatment. Moreover, the considerations with respect to effect of salt, aldehyde, temperature and time of cook were known per se in the bait fish egg processing art, as in Sellen U.S. Patent No. 1,703,324, one of the references cited in the patent in suit.

### XIX.

Puget Sound Salmon Egg Company, Inc., as exclusive licensee under the patent in suit, has realized considerable commercial success with respect to bait fish eggs enlarged in accordance with the process of the patent in suit, with the current level of sales of this product by Puget Sound Salmon Egg Company, Inc. being about $500,000.00 per year.

### XX.

Plaintiff, Puget Sound Salmon Egg Company, Inc., has placed, and places, notice of United States Patent No. 2,951,761 on containers of bait fish eggs sold by it coming within the scope of the process and product claims of said patent.

### XXI.

Siberian Fish Products Company in 1960, and Pacific American Fisheries of Bellingham, Washington, 1961, each began using an acid type processing for expansion of bait fish eggs, apparently within the scope of the patent in suit. Notices of infringement were addressed to each of these concerns by plaintiff at the time, and each of these concerns thereupon ceased the allegedly infringing activity. Except for these brief occurrences of apparent infringement, and

for the activities of the defendants in this suit, the patent in suit has been respected throughout the bait fish egg packing industry.

## XXII.

K. Clint Stephens was employed by Lucky Brands, Inc., an Idaho corporation, from 1961 to 1965, and during this period participated on a continuing basis in the processing of salmon eggs for bait. Lucky Brands, Inc. processed salmon eggs using both acid and base type processes during this time. Some of the eggs produced by Lucky Brands, Inc. during this time were enlarged by a process involving soaking the eggs in an acid solution prior to soaking in water for enlargement. Lucky Brands, Inc. experienced a significant rate of spoilage of eggs enlarged by alkaline type processing, as opposed to the acid type enlargement process.

## XXIII.

On October 22, 1964, plaintiff gave written notice to Lucky Brands, Inc. that it believed it was infringing the patent in suit, and at this time, K. Clint Stephens also received actual notice of the patent in suit.

## XXIV.

About April, 1965, K. Clint Stephens left Lucky Brands, Inc. and formed Shoshoni, Inc., becoming its president and the active, moving force behind this corporation. Notwithstanding Stephens' knowledge of the patent in suit, Shoshoni, Inc. manufactured and sold acid type enlarged eggs. On May 8, 1968, plaintiff gave written notice of claimed infringement to Shoshoni, Inc. Shoshoni, Inc. continued to process eggs and further, taught others to process eggs according to an acid type expansion process covered by the patent.

## XXV.

The process of making acid type expanded bait fish eggs as practiced by the defendant Shoshoni, Inc. generally includes the following steps:

*Preliminary Preparation*

(a) placing raw fresh eggs in a hot water solution containing approximately 10% salt,

(b) slurrying the eggs,

(c) singling the eggs using a singling screen,

(d) draining the eggs,

(e) placing the eggs in 100% salt brine solution,

(f) agitating the eggs for from 12 to 20 minutes according to characteristics of the eggs,

(g) draining the eggs for at least 6 hours,

(h) packing the eggs into kegs for shipment or storage,

*Cooking*

(i) taking approximately 50 pounds of eggs from storage and placing them in about 10 gallons of hot water, 2 pounds salt and 2 ounces of 37% formaldehyde solution,

(j) slurrying the eggs and skimming off and discarding any broken eggs which float to the surface,

(k) draining the eggs on a draining screen for approximately five minutes,

(l) placing the 50 pounds of eggs in a cooker containing approximately 15 gallons of hot water, 15 pounds of salt, 5 ounces by volume of 37% formaldehyde solution, 8 ounces by volume of calcium propionate, 8 ounces by volume of sodium benzoate, and any dyes that are needed,

(m) cooking the eggs for a period during which the temperature of the eggs and solution rises to boiling temperature, and

(n) thereafter draining the eggs on a draining screen,

*Acid Soak*

(o) placing the cooked eggs into a solution containing approximately 15 gallons of cold tap water and

32 ounces of hydrochloric acid (Technical Grade, 20° Baume),

(p) stirring the eggs occasionally until the acid has completely penetrated the eggs (approximately 1 ½ hours),

(q) draining the eggs on a draining screen,

*Expansion*

(r) placing the eggs in approximately 30 gallons of cold tap water for about 1 hour, and draining the eggs on a draining screen,

(s) placing the eggs in a solution of hot water for about 1 hour,

(t) draining the eggs on a draining screen, and

(u) placing the eggs in 2 oz. jars, and sealing the eggs in the jars by screw lids.

### XXVI.

■ Method claims 1, 3, 13 and 15 of United States Letters Patent No. 2,951,761 are directly readable on, and infringed by the above-outlined process as practiced by defendant Shoshoni, Inc. Product claims 2, 4, 14 and 16 of said patent are directly readable on and infringed by the acid-type expanded fish eggs produced by such processing.

### XXVII.

Method claim 5 and product claim 6 of United States Letters Patent No. 2,951,761 are infringed by the above-outlined Shoshoni, Inc. process and product, it being evident from the testimony that is the commercial practice of Shoshoni, Inc. to swell the eggs in water until the eggs reach "at least 125% of the original egg volume", and it also being evident that, under the doctrine of equivalents, a dyeing of the eggs occurs whether the dye is added at the time of the acid soak (as recited in claims 5 and 6), or whether the dye is added during the cooking of the eggs and/or subsequently (as in the Shoshoni, Inc. processing), and whether or not the dye is a fluorescent dye.

### XXVIII.

Method claim 17 and product claim 18 of United States Patent No. 2,951,761 are infringed by the above-outlined process, the practice of Shoshoni, Inc. as to adding calcium propionate as a mold inhibitor and sodium benzoate as a preservative during the cooking stage being within the scope of or fully equivalent, under the doctrine of equivalents, to the step in process claim 17 of "treating the eggs with a preservative", particularly in view of the recitation in the patent description at column 4, lines 69–72, of the addition to the eggs of tri-methylbenzyl ammonium chloride "to prevent mold and bacterial growth in the finished product. Obviously any other combination of a bactericide and fungicide may be used."

### XXIX.

Method claim 19 of United States Patent No. 2,951,761 is infringed by the above-outlined process and processing variations thereof as practiced by defendant Shoshoni, Inc., by reason of the various steps of this claim either being fully readable on the above-outlined process or being fully equivalent to the quantitative recitations in the claim, particularly in the following respects:

(a) The concentration of the sodium chloride and formaldehyde solution (the Shoshoni, Inc. processing involving somewhat less concentration of sodium chloride and somewhat greater concentration of formaldehyde than recited in the claim), in view of testimony indicating that the effect of sodium chloride concentration and formaldehyde concentration with regard to hardening of the egg is additive, as are the time and temperature of the heat treatment.

(b) The step of the claim as to "heating the eggs in brine solution to a temperature between 120°F. and the boiling point of the solution for a period of time from 10 minutes to 2 hours" is readable on or

fully equivalent to the processing of defendant Shoshoni, Inc., involving a time of cook between 25 or 30 minutes and 1 hour, during which period the temperature rises from about 140°–160° to boiling.

(c) The step of claim 19 as to acid soak "for a period of time between 2 and 24 hours" is readable on or fully equivalent to the processing as practiced by defendant Shoshoni, Inc. which is acknowledged to be approximately 1 and ½ hours, and sometimes longer, the evidence indicating in this respect that the important consideration is that the acid substantially completely penetrates the eggs.

(d) The step of claim 19 as to soaking the eggs in fresh water "until a volume change takes place rendering the eggs at least about 125% their original volume" is readable on or fully equivalent to the processing as practiced by defendant Shoshoni, Inc., it being apparent from the evidence that it is common commercial practice of Shoshoni, Inc. to increase the volume of the eggs until the eggs are rendered about double their original volume.

### XXX.

The processing of acid type expanded eggs by defendant Shoshoni, Inc., to the extent it includes the addition of sugar as a constituent during the cooking stage, does not avoid infringement of any patent claim otherwise found to be infringed.

### XXXI.

The processing of acid type expanded eggs by Shoshoni, Inc., to the extent it involves so-called recycling of acid type expanded eggs to a second or subsequent acid soak followed by a second or subsequent water soak to further swell the eggs, does not avoid infringement of any patent claim otherwise found to be infringed.

### XXXII.

Defendant K. Clint Stephens taught, and personally instructed Shoshoni's bait plant manager Albert Evans to teach others, including Gary Marvin, Art Krug and James J. Vander Mause, General Manager of Uncle Josh Bait Company, Fort Atkinson, Wisconsin, to practice the acid type expansion process. Shoshoni, Inc. has processed acid type expanded eggs both at its main plant in Meridian, Idaho, and at its plant in Grand Rapids, Michigan.

### XXXIII.

James J. Vander Mause is an officer of the Uncle Josh Bait Company, of Fort Atkinson, Wisconsin. Uncle Josh had initially purchased processed expanded bait eggs from Shoshoni, Inc. in bulk, but Mr. Vander Mause was taught the acid type expanded egg process at Shoshoni, Inc. in September, 1969 so that Uncle Josh would be able itself to process raw eggs purchased from Shoshoni, Inc. Plaintiff, upon learning of this, notified Uncle Josh Bait Company of its alleged infringement.

### XXXIV.

Shoshoni, Inc. has widely marketed acid type expanded eggs, under a variety of labels and brand names, both directly and under so-called private labels. One private label customer of Shoshoni, Inc. has been Kamloops Distributing Company of Boise, Idaho, which Shoshoni, Inc. assisted in designing new labels for the eggs. On April 20, 1970, plaintiff advised Kamloops Distributing Company that its sale of certain bait eggs was believed to infringe the patent in suit.

### XXXV.

As early as 1947 Neptune Fish Products Company of Seattle used a process of expanding bait fish eggs involving soaking of the eggs in an acetic acid solution for at least 48 hours and soaking of the eggs in several changes of water until they were swollen, followed by a soap wash to neutralize the eggs. The

evidence also indicates that eggs so processed were marketed as early as 1949 by Neptune Fish Products Company.

### XXXVI.

The evidence further indicates that the egg processing as practiced by Neptune Fish Products Company was conducted on a secret, suppressed and concealed basis, it having been the practice at Neptune Fish Products Company to misbrand or not brand chemicals used in the processing and to conduct the processing on a basis such that no one at Neptune Fish Products Company except Mrs. Kinney and her late husband, Mr. J. Warren Kinney, knew the process.

### XXXVII.

Evidence also indicates that, well prior to the application for the patent in suit, Siberian Fish Products of Seattle had marketed and continues to market an expanded bait fish egg of an alkaline character.

### XXXVIII.

■ There is also evidence to indicate that the process of egg expansion as practiced at Siberian Fish Products was and continues to be of a secret and concealed nature, it being the testimony of Mr. Sarich and Mr. Stephan that they did not know and still do not know of the nature of the Siberian Fish Products processing, and there being no evidence offered by the defendant as to any knowledge in the industry of the nature of the Siberian expanded egg processing. Further, even assuming from the final base pH of the Siberian Egg, that it is produced by a base type process, the sale of eggs of this type would not be an anticipation under 35 U.S.C. § 102 of the acid type processing claimed in the patent in suit.

### XXXIX.

■ The evidence also clearly indicates it is impossible to determine how an expanded bait fish egg has been processed simply by analysis of the eggs as marketed, since neither the pH of the eggs nor the ion content provides any indicia of whether expansion of the eggs occurred incident to an alkaline soak or an acid soak or otherwise. From the inability to determine the nature of the processing from the final product it follows that sale of expanded eggs by Neptune Fish Products Company did not provide the public with any information as to how Neptune Fish Products processed the eggs to obtain expansion. Thus, the use of an expansion process by Neptune Fish Products Company was on a basis whereby the process did not become known to others, and the sale of expanded eggs thus processed does not constitute prior public use of the process and does not invalidate the patent claims in suit.

### XL.

■ Defendants content that the invention of the patent in suit would have been obvious, at the time the invention was made, to a person having ordinary skill in the art. The evidence strongly indicates that the process disclosed and claimed by the patent, and the products of this process, were not obvious to a skilled person having knowledge of the prior art at the time of the invention was made. There is evidence that there were several attempts in the industry to develop a marketable expanded egg prior to Mr. Stephan's making the invention forming the basis of the patent in suit and that these attempts (by Mr. Nicholas Andreev at Neptune Fish Products Company, by Mr. Sarich at Puget Sound Salmon Egg Company, and by Dr. Shockey for Puget Sound Salmon Egg Company) were unsuccessful. It also appears that there was considerable commercial need in the industry for a marketable expanded egg in the late 1940's and early 1950's. The marked commercial success of the patented process as employed by plaintiff further demonstrates the unobviousness of the invention. There has also been recognition of the patent in the industry, with brief apparent infringements by Siberi-

an Fish Products in 1960 and by Pacific American Fisheries in 1961 having been terminated on notice. Perhaps the best indication as to the unobvious nature of Mr. Stephan's invention is Mr. Stephan's own testimony that several hundred tests involving a wide variety of types of ingredients and treatment conditions, and an empirical approach were necessary to discover the processing forming the basis of the patent, notwithstanding that he was a skilled and experienced protein chemist.

### XLI.

■ Defendants contend that the patent in suit is invalid for failing to comply with the provision of 35 U.S.C. Section 112 in that the claimed process is not disclosed "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same," and that it does not set forth "the best mode contemplated by the inventor for carrying out his invention". The sufficiency of the specification of a patent is to be determined by reading it in the light of the state of the art at the time the invention was made, and the description need not contain what is well-known and in common use by those skilled in the art. Even if some experimentation is necessary in order to satisfactorily perform the process of the patent, this does not render a patent void if the patent specification contains sufficient disclosure for one skilled in the art to reproduce his invention using his knowledge of the art.

### XLII.

■ Defendants principally contend that Examples 1–4 set forth in the patent do not produce a marketable egg. In determining the adequacy of the disclosure, the entire patent, and not just the Examples, must be considered. Applying this rule, and without even considering the presumption in plaintiff's favor, the evidence clearly preponderates in favor of the validity of the

patent under 35 U.S.C. Section 112. The specification taken as a whole teaches a variety of processing times and temperatures sufficient to teach one skilled in the art to produce a marketable expanded egg.

### XLIII.

■ At the time Mr. Sarich contacted the patentee, Mr. John Thomas Stephan, Mr. Sarich advised Mr. Stephan of the alkaline expanded egg then being marketed by Siberian Fish Products and furnished Mr. Stephan with a sample of the Siberian egg. When Mr. Stephan attempted to reproduce the Siberian egg by assuming the egg had been expanded in sodium hydroxide solution, he was unsuccessful. After finalizing the invention disclosed in the patent in suit over the course of several hundred experiments, Mr. Stephan chose to draft his own patent application to cover the invention and did so after contacting the United States Patent Office and receiving a pamphlet from it outlining the procedure to be followed. At the time he prepared and filed his patent application Mr. Stephan did not know the egg expansion process practiced by Siberian Fish Products Company, and such process is still not known to him or to anyone else outside the Siberian Fish Products Company to this date, at least to the extent of his knowledge and that of Mr. Sarich. pH tests of the Siberian egg indicated the egg was of a slightly alkaline nature (about pH 8.5), and since the final pH of eggs made according to his process is usually about pH 3, Mr. Stephan, in good faith, considered his egg to be significantly different and unrelated to the Siberian egg, particularly since alkaline treatment tends to disperse protein whereas acid tends to coagulate protein. In view of this and the actual lack of knowledge by Mr. Stephan and Mr. Sarich as to the Siberian processing, and in view of the circumstance that the Siberian process was unknown to Mr. Stephan and in legal effect was not prior art under 35 U.S.C. Section 102, the limited information Mr.

Stephan could have made available to the Patent Office would not have been material to the Patent Office's decision to allow the claims of the patent in suit, which claims are all limited to use of an acid soak prior to swelling of the eggs in water, and thus no fraud arose from Mr. Stephan not informing the Patent Office of the existence of the Siberian expanded egg.

#### XLIV.

Plaintiff's notices of believed infringement to Uncle Josh Bait Co. and to Kamloops Distributing Co. were well founded, and further were made in good faith. Plaintiff was clearly within its legal rights in sending these notices and the charge of unfair competition is unfounded.

#### XLV.

In view of the lack of knowledge by Mr. Sarich and Mr. Stephan as to the manner of processing by Siberian Fish Products to obtain an alkaline expanded egg, and in view of the lack of materiality with respect to the then unknown and still unknown Siberian process with regard to the validity of the claims of the patent in suit, the defendants' charge of unfair competition based on the allegation of fraud is also unfounded.

#### XLVI.

Having found no basis to uphold the defendants' charge of unfair competition, the alleged anti-trust violations of plaintiff charged by the defendant must also fall.

### CONCLUSIONS OF LAW

#### I.

This Court has jurisdiction of the parties and the subject matter of this action.

#### II.

Stephan Patent No. 2,951,761 is good and valid in law, and each of claims 1–19 thereof is valid.

#### III.

Defendants Shoshoni, Inc. and K. Clint Stephens have infringed each of claims 1–6 and 13–19 of Stephan United States Patent No. 2,951,761 and have actively induced infringement of said claims by others, within the terms of 35 U.S.C. § 271(b).

#### IV.

Defendant K. Clint Stephens is personally liable for such infringement, both individually and jointly with the corporate defendant Shoshoni, Inc.

#### V.

Plaintiff is not guilty of unfair competition, and has not violated the anti-trust laws of the United States.

#### VI.

Plaintiff is entitled to entry of a judgment enjoining the defendants, and each of them, from further infringement of, and from inducing others to infringe, Stephan Patent No. 2,951,761.

#### VII.

Plaintiff is entitled to damages from defendants, the amount thereof to be determined by the Court after additional discovery relating to the extent of the damages.

### JUDGMENT AND DECREE

This cause having been heard on September 9, 10, 11, 16 and 17, 1970, and the Court being fully advised in the premises, and having made and entered its Findings of Fact and Conclusions of Law, it is now:

Ordered, adjudged and decreed as follows:

1. This Court has jurisdiction of the parties and of the subject matter of this action.

2. United States Letters Patent No. 2,951,761 was duly and legally issued on September 6, 1960, to one John Thomas Stephan, who has been and continues to be the sole owner of said United States

Letters Patent No. 2,951,761, and the plaintiff herein, Puget Sound Salmon Egg Company, Inc., is the exclusive licensee of said John Thomas Stephan by reason of a certain license agreement dated November 19, 1956, the said license agreement by its terms granting plaintiff Puget Sound Salmon Egg Company, Inc. the right to bring and maintain this action.

3. Each of claims 1–19 of said United States Letters Patent No. 2,951,761 is valid.

4. Defendants Shoshoni, Inc., and K. Clint Stephens, and each of them, have infringed each of claims 1–6 and 13–19 of United States Letters Patent No. 2,951,761.

5. Defendants Shoshoni, Inc., and K. Clint Stephens, and each of them, have actively induced infringement of each of claims 1–6 and 13–19 of United States Patent No. 2,951,761 by others, within the terms of 35 U.S.Code Section 271(b).

6. Defendant Shoshoni, Inc., its officers, agents, servants and employees, and all persons in active concert or participation with it or them, are hereby jointly and severally, for the life of said United States Letters Patent No. 2,951,761, enjoined and restrained:

(a) From directly or indirectly making, having made or selling any enlarged fish eggs covered by any product claim of said United States Letters Patent No. 2,951,761, and from directly or indirectly practicing any method of enlarging fish eggs within the scope of any process claim of said United States Letters Patent No. 2,951,761, within the jurisdiction of the United States of America; and

(b) from actively inducing acts of infringement by others or contributing to the acts of infringement by others, of said United States Letters Patent No. 2,951,761, within the definitions of these terms as contained in 35 U.S.C. Section 271(b).

7. Defendant K. Clint Stephens, his agents, servants and employees, and all persons in active concert or participation with him or them, are hereby jointly and severally, for the life of United States Letters Patent No. 2,951,761, enjoined and restrained:

(a) From directly or indirectly making, having made or selling any enlarged fish eggs covered by any product claim of said United States Letters Patent No. 2,951,761, and from directly or indirectly practicing any method of enlarging fish eggs within the scope of any process claim of said United States Letters Patent No. 2,951,761, within the jurisdiction of the United States of America; and

(b) from actively inducing acts of infringement by others or contributing to the acts of infringement by others, of said United States Letters Patent No. 2,951,761, within the definitions of terms as contained in 35 U.S.C. Section 271(b).

8. Plaintiff is not guilty of acts of unfair competition or of violation of the anti-trust laws of the United States, against the defendants or either of them.

9. Plaintiff is entitled to an accounting and to an award of damages from the defendants, who are jointly and severally liable with respect thereto, the amount of the damages to be determined by the Court after additional discovery directed to an accounting and relating to the extent of damages.

10. Determination as to awarding of attorneys fees and as to allocation of taxable costs is deferred pending completion of the accounting and final award as to damages.

11. Jurisdiction of this cause is retained by the Court for the above-stated purposes and for the purpose of enabling either party to this judgment and decree to apply to the Court at any time for such direction, citation, order or further decree as may be necessary or appropriate for the construction, interpre-

tation, modification, or the carrying out of this judgment and decree or the enforcement or compliance therewith, or for the punishment of any violation thereof, or for such other or additional relief as may become necessary to realize the intent and purpose of this judgment and decree.